# In the United States Court of Federal Claims

No. 10-553C
(Filed: May 29, 2015)

|  |  |
|---|---|
| FORT HOWARD SENIOR HOUSING ASSOCIATES, LLC, | Enhanced-Use Lease; Department of Veterans Affairs; Termination for Default; Breach of Contract; Excuse; Force Majeure; Reformation; Mutual Mistake; Impossibility |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

*Steven H. Jesser*, Glenview, IL, for plaintiff.

*Sheryl Lynn Floyd*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Joyce R. Branda*, Acting Assistant Attorney General, and *Robert E. Kirschman, Jr.*, Director, Commercial Litigation Branch, for defendant.

## O P I N I O N

**FIRESTONE**, *Judge*.

Pending before the court is the government's motion for summary judgment, filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). At issue is whether the Department of Veterans Affairs ("VA") properly terminated for default the September 28, 2006 Enhanced-Use Lease ("Lease") between the VA and plaintiff Fort Howard Senior Housing Associates, LLC ("FHSHA") at the Fort Howard VA Medical Center in Baltimore County, Maryland. The Lease was executed pursuant to the VA's authority under 38 U.S.C. §§ 8161-8167 and gave FHSHA the right to occupy

the property for a term of 65 years, with an option to extend the Lease for 10 additional years.  In exchange for its occupation, FHSHA was required to (1) pay consideration in the form of rent; (2) design, develop and construct a new 10,000 square foot Community-Based Outpatient Clinic ("CBOC") within 39 months; (3) design and construct multi-use residences onsite in compliance with "applicable" state and local laws, codes, and regulations; and (4) protect, preserve, maintain, and repair the property.

After several years, the VA became concerned about the status of the project and, starting in February 2009, the VA began sending notices of default to FHSHA. Ultimately, the VA determined that FHSHA was in default of the Lease and, on August 17, 2009, the VA terminated the Lease for default on the primary grounds that FHSHA had failed to (1) commence construction of the new CBOC such that it would be completed with the timeframe required under the Lease,[1] (2) maintain and secure the property, and (3) pay its proportionate share of the utility bills.

FHSHA filed its initial complaint on August 16, 2010 and an amended complaint on June 29, 2012.[2]  In its complaint, plaintiff asserts that the VA's termination was wrongful on two main grounds: (1) its failure to build the CBOC was excused by the force majeure clause in the Lease, and (2) the government otherwise breached the Lease

---

[1] Plaintiff had not yet begun construction.

[2] Plaintiff's amended complaint added a new count for "tortious interference with contractual relationships and prospective economic advantages" and a claim for money damages based on costs, fees and expenses and for future development fees and profits.  The court dismissed plaintiff's money claims for lack of jurisdiction on September 11, 2012, on the grounds that plaintiff had not submitted its money claims to a contracting officer as required by the Contract Disputes Act, 41 U.S.C. §§ 7101-7109.  Order Granting Motion to Dismiss, Fort Howard Senior Housing Associates, LLC v. United States, No. 10-553 (Fed. Cl. Sept. 11, 2012).

on various grounds.  In its amended answer, the government counterclaimed for breach of the Lease and seeks $313,328.45 as the amount allegedly owed to the government under the Lease.

At the heart of FHSHA's defense to the termination is its contention that it entered into the Lease with the understanding that it would be able to build 1,300 housing units on the site and that VA's requirement that it comply with Baltimore County zoning regulations—which without a variance would limit development to 550 units—made the project economically unviable, requiring renegotiation.  FHSHA argues that Baltimore County's failure to accept plaintiff's request for an exemption from local requirements amounted to a force majeure event under the terms of the Lease.  Plaintiff further argues that the VA's insistence that plaintiff comply with local laws in connection with the project amounted to a breach of contract on several grounds and further excused FHSHA's obligations under the Lease.  Plaintiff argues that the VA, as the federal government, is not required to comply with local laws and regulations, and thus it was the VA's insistence that plaintiff meet local zoning requirements that made the project economically unviable.

Discovery in the case is now completed.  The government has moved for summary judgment, asking the court to find that the undisputed facts establish that the termination for default was reasonable and proper and that plaintiff's nonperformance is not excusable for any of the reasons advanced by the plaintiff.  In response, FHSHA argues that the government's motion should be denied on the grounds that there are genuine issues of material fact as to each of the government's alleged grounds for termination for

default and that, even if the termination was correct, FHSHA has presented sufficient facts to show that the failure to act was excusable under the Lease.  For the reasons set forth below, the court finds that the government is entitled to summary judgment with regard to the default termination for failing to build the CBOC and that the grounds asserted by FHSHA for its failure to act do not constitute excuses as a matter of law. Because FHSHA's failure to build the CBOC within the time provided for under the Lease justified a termination for default and the failure cannot be excused, the court does not reach the alternative grounds for summary judgment set forth in the government's motion.

## I.     STATEMENT OF UNDISPUTED FACTS

The following facts are not disputed.  Disputed facts relevant to FHSHA's defense that its failure to perform was "excused" are discussed in connection with those claims.

### A.     The Lease

The authority for the VA to enter enhanced-use leases ("EUL") such as the Lease is set forth in 38 U.S.C. §§ 8161-8167.  Pursuant to VA Handbook and Directive 7415, the VA Secretary assigned the Office of Asset Enterprise Management as the office within VA responsible for oversight of VA's EUL program and management of enhanced-use projects identified as VA asset initiatives.  Def.'s App'x 295-323, VA Handbook and Directive 7415.

#### 1.     Scope of the Lease

On September 28, 2006, FHSHA and VA entered into an EUL.  The Lease identifies that FHSHA's role is to serve as the "master developer of the Property, with the

right and obligation to design, develop, construct, alter, operate, maintain, repair, replace, sublease, finance, improve and renovate the Property into the Project, and to demolish any existing buildings, structures and improvements on the Property, in accordance with the terms of this Lease."  Def.'s App'x 2.  The Lease defines "Project" as "[t]he Lessee's design, development, construction, demolition, alteration, operation, maintenance, repair, replacement, subleasing, financing, improvement, and renovation of the Property as provided in this Lease."  Pursuant to the Lease, the VA leased the "Property" to FHSHA for a term of 65 years, with a FHSHA option to extend for an additional 10-year period as long as an uncured Lessee Event of Default did not exist.  The Lease defines "Property" as:

> [t]hat certain real property consisting of approximately ninety (90) acres (i) as described and depicted in Exhibits A, with Attachment 1 to Exhibit A, and E attached hereto and includes (ii) all buildings, improvements, utilities and infrastructure either existing or erected or placed thereon, but: (1) will not include the CBOC Parcel and the CBOC when the CBOC Parcel and CBOC revert to VA upon the completion of construction and acceptance by the Department, in accordance with Article 4, paragraph A.4. and (2) will include the ten contiguous acres for the State of Maryland Veterans Home described in Exhibit A, with Attachment 1 to Exhibit A, and Exhibit H in the event that such ten contiguous acres are added to this Lease during the term by amendment in accordance with Article 4.A.5 of this Lease.

Id. at 7, Article 1.  The Lease defines "CBOC" as the 10,000 square foot Community-Based Outpatient Clinic to be designed, developed and constructed on the Property by FHSHA for the VA as part of the consideration provided by FHSHA to VA under the Lease.  Id. at 4.

## 2.    FHSHA's Consideration

In exchange for VA leasing the Property to FHSHA, FHSHA agreed to provide

VA consideration in the form of "Rent," and to complete both a housing project and an

outpatient clinic.  The Lease defines "Rent" as

> [c]onsideration provided to VA for the Lease pursuant to Title 38 U.S.C.
> Section 8162 that includes discounts to veterans as described in Exhibit G,
> paragraph G.1; and in the event that discounts to veterans are not provided
> in accordance with Exhibit G, paragraph G.3, payments to VA as
> compensation for such failure to provide such discounts to veterans in
> accordance with Article 23.c.3.c.

Id. at 7-8.  Article 4 of the Lease identifies the additional items that FHSHA and VA

agreed "constitute fair consideration for the Lease."  Id. at 10; id. at 892, Infantino Dep.

149:4-20, Jan. 23, 2014.

Pursuant to Article 4.A.1 of the Lease, FHSHA agreed to:

> Finance, design, develop, construct, demolish, alter, operate, maintain,
> repair, replace, sublease, improve, renovate and market the Property into
> the "Project" in accordance with this Lease (including but not limited to
> Article 10 hereof), all applicable local and State laws, codes and
> ordinances, and the National Fire Protection Association ("NFPA") 101
> Life Safety Code.

Id. at 10, Article 4.A.1.  Pursuant to Article 4.A.2 of the Lease, FHSHA agreed to:

> [(i)] obtain all applicable local and State permits, licenses, and approvals
> (including those approvals of VA) necessary for construction and operation
> of the Permitted Uses; (ii) comply with all applicable local, State, and
> Federal requirements during operation of the Permitted Uses (including the
> applicable version of the National Fire Protection Association (NFPA) 101
> Life Safety Code); (iii) undertake its construction and operation activities
> so as to not unreasonably interfere with the operations, or otherwise deprive
> the Department of its quiet use and enjoyment of the CBOC or such other
> facilities on the Property as may be under VA possession, control, use
> and/or occupancy ("VA Facilities") and use all reasonable and commercial
> efforts to conduct any of its construction activities involving noise, dirt, or
> other emissions that could negatively affect activities or operations of VA
> Facilities to times falling within normal business hours; and (iv) operate the

Project in accordance with existing applicable laws pertaining to a drug-free environment.

Id., Article 4.A.2.  Pursuant to Article 4.A.3 of the Lease, FHSHA agreed to

"[a]ccomplish a phased reuse and redevelopment of the Property, not to exceed three (3)

phases, as set forth in the 'Parcelization Plan' in the Development Plan hereto, within one

hundred and fifty-nine (159) months after the Effective Date . . . ."  Id., Article 4.A.3.

Pursuant to Article 4.A.4 of the Lease, FHSHA agreed to

> [d]esign, construct, and develop a 10,000 GSF VA Outpatient Clinic
> facility (CBOC) on a parcel of the Property ("CBOC Parcel") . . . .  Lessee
> shall complete the construction of the CBOC and obtain final acceptance
> thereof . . . no later than thirty-nine (39) months after the Effective Date . . .
> .  Upon completion of construction of the CBOC and final acceptance by
> [the VA], Lessee shall, at no expense or liability to [the VA], transfer all of
> Lessee's right, title and interest in and to the CBOC to [the VA], and
> simultaneously Lessee's leasehold interest in the CBOC Parcel shall
> automatically revert to VA at no expense or liability to [the VA] and the
> CBOC shall cease being part of the Property.

Id. at 11, Article 4.A.4.  Article 10.H.1 further requires that, "Except for the CBOC,

Lessee shall (i) conduct the Project Development so as to comply with all applicable

State and local laws, codes, ordinances, permits and inspections . . . ."  Id. at 26, Article

10.H.1.

Articles 4.A.3 and 4.A.4 are subject to the force majeure clause, which the Lease

defines as

> [a]ny of the following that directly cause any of Lessee's obligations
> hereunder not to be performed in a timely manner: (1) an earthquake,
> hurricane, tornado, flood, or other similar act of God; (2) fire; (3) strikes or
> similar labor disputes provided such strike or similar dispute is beyond
> Lessee's control and provided Lessee takes all steps reasonably possible to
> remediate such strike or similar dispute; (4) acts of the public enemy; (5)
> inability to obtain labor or materials or clear access to the Project or

> unreasonable delay in approving permit applications for the Project by reason of acts or omissions of any governmental body not caused by Lessee's actions or omissions; (6) rebellions, riots, insurrections or civil unrest; (7) unusually severe weather conditions that actually cause similar construction or development activities in the area of the Project to be suspended; or (8) an unknown environmental hazard or unknown hazardous substance (e.g., one that Lessee did not know of or have notice of by the Effective Date) affecting the Property.

Id. at 5, Article 1.

In addition to the housing project and outpatient clinic, FHSHA agreed to provide upkeep services for the property.  Pursuant to Article 4.A.7 of the Lease, FHSHA agreed to "[b]e responsible for the operation, management, and maintenance of the Property in accordance with the provisions herein . . . ." Id. at 12, Article 4.A.7.  Pursuant to Article 4.A.9 of the Lease, FHSHA agreed to "[b]e responsible for maintaining and securing all necessary access to the Property for construction and operation of the Project and underlying facilities." Id. at 13, Article 4.A.9.  Pursuant to Article 4.D of the Lease, FHSHA agreed that, "Throughout the Term, Lessee shall maintain the Property in a good, clean and safe condition and shall make all repairs thereto, interior and exterior and structural and non-structural which are required to maintain the Property in a good, clean and safe condition." Id. at 15, Article 4.D.  Pursuant to Article 4.E of the Lease, FHSHA agreed that, "During the Term, Lessee shall be responsible for providing or arranging for, at no cost or expense to VA, the infrastructure (including without limitation, all utility metering) for all water, gas, electricity, sewer, telephone and other utilities serving the Property . . . ." Id., Article 4.E.

### 3.    Compliance with Federal, State, and Local Laws

Consistent with 38 U.S.C. § 8167 (2004), Article 17.A of the Lease states, "The United States' fee title interest in the Property and [the VA's] interest in this Lease shall not be subject, directly or indirectly, to any State or local laws relative to taxation, fees, assessment or special assessments." Id. at 44, Article 17.A.

Article 17.C of the Lease states, "It is understood that the intent of the parties is that [the VA] shall not be obligated to pay any charges, impositions, or assessments directly or indirectly made against the Property during the term hereof." Id., Article 17.C.

Further, Article 33 of the Lease states:

> Unless the Lessee can demonstrate to the satisfaction of [VA] in the form of a written determination or written correspondence from the U.S. Department of Labor that the Lease or the Project is exempt therefrom, Lessee shall comply with the requirements of the Davis-Bacon Act, as amended, 40 U.S.C. Section 3141 et. seq. and the relevant rules, regulations and orders of the Secretary of Labor applicable thereto.

Id. at 64, Article 33.  Additionally, as discussed below, Articles 4.A.1, 4.A.2, and 10.H.1 of the Lease set standards for the specific requirements for FHSHA's compliance with local and state laws.

### 4.     Representations, Warranties, and Covenants

Pursuant to Article 6.C.1 of the Lease, FHSHA represented, warranted, and covenanted that "[VA] has made no representations concerning the Property's condition, nor has it agreed to alter or improve the Property." Id. at 19, Article 6.C.1.

Additionally, pursuant to Article 6.C.2 of the Lease, FHSHA represented, warranted, and covenanted that

[VA] has made no representations or warranties concerning the fitness or suitability for any particular use of the Property and except as provided in the Lease (including but not limited to provisions in Article 4 and Article 6 pertaining the responsibility of [VA] and United States with respect to hazardous substances) [VA] shall not be liable for any latent or patent defect in such Property, nor has it agreed to alter, improve or maintain such Property.

Id. at 20, Article 6.C.2.

## 5.     The Development Plan

As described in Article 10.A.1 of the Lease, "Lessee has commenced and completed the Development Plan which sets forth Lessee's overall plans, including but not limited to planned Permitted Uses for the Parcels, for developing the Property into the Project pursuant to this Lease . . . ." Id. at 23, Article 10.A.1.[3] The Development Plan includes, amongst other items, the obligation to construct 1,300 units—including 353 active senior units; 481 independent living units; 165 assisted living units; and 106 skilled nursing units—and 170,000 square feet of amenities and services. Id. at 98, 103.[4] Pursuant to Article 4.A.3 of the Lease, FHSHA was required to develop the Property in accordance with the Development Plan. Id. at 10.

Article 24.H of the Lease states, "[I]n the event of a conflict in interpretation of provisions of this Lease between the Development Plan at Exhibit E of this Lease, and Articles 1-31 or any other Exhibit of this Lease, Articles 1-31 or any other Exhibit of this

---

[3] The Development Plan was attached to the Lease as Exhibit E and was never amended by the parties. Id. at 80-187, Exhibit E, Development Plan.

[4] The Development Plan did not reference the Baltimore County Land Use Regulation, which plaintiff contends would have limited the project to only 550 housing units. See id. at 93, 971.

Lease shall control . . . ." Id. at 54, Article 24.H; id. at 915, Infantino Dep., 221:9-222:3,

Jan. 23, 2014.

Article 16.C.11 of the Lease states:

[VA] and the Lessee shall cooperate by considering any and all proposed
Lease amendments which may be requested by any proposed lender, or
may otherwise be reasonably necessary, to implement the provisions of this
Article; provided, however, that any such amendment shall not in any way
affect the Term or the rent nor affect adversely in any material respect any
rights of the Department under this Lease.

Id. at 44, Article 16.C.11.  Similarly, Article 24.T of the Lease states:

[VA] and Lessee shall cooperate in including in this Lease by suitable
amendment from time to time any provision which may be requested by
any proposed lender; provided, however, that any such amendment shall
not in any way affect the Term nor affect adversely in any material respect
any rights of the Department under this Lease.

Id. at 57, Article 24.T.

### 6.    Default

Article 23.A of the Lease itemizes what is considered an "Event of Default" by

Lessee.  Amongst other items, Events of Default include:

Lessee fails to pay any monetary obligation due under the provisions of this
Lease, and such failure is not cured within the manner and time periods
provided by Article 23.B of this Lease;

Failure of Lessee, its assigns or sublessees, to perform or observe any
material requirement, consideration, covenant, condition and/or
commitment required by this Lease, and such failure is not cured within the
manner and time periods provided for by Article 23.B of this Lease;

[L]essee fails to complete Phase I of the Development Plan as follows: (a)
Construct the CBOC and obtain a Certificate of Acceptance by [VA] within
thirty-nine (39) months of the Effective Date in accordance with
Development Plan, or (b) Complete construction and commence operation

of the LCC facilities pursuant to Phase I of the Development Plan within fifty-seven (57) months of the Effective Date.

Id. at 49-50, Article 23.A.  Article 23.C.1 of the Lease states:

> Upon the occurrence of a Lessee Event of Default in failing to complete construction of Phase 1 (including failure to complete the CBOC and convey title to VA), as provided in Paragraph A.6 of this Article 23, which either (a) continues beyond the expiration of any applicable notice and cure periods, or (b) is not fully cured after the end of sixty-three (63) months following the Effective Date, extended by a period equal to the period or periods of Force Majeure, if any, that prevented such completion of construction by such period of sixty-three (63) months, whichever event of clause (a) or (b) of this paragraph C.1 first occurs, VA may, notwithstanding Article 16 or any other provisions of this Article, terminate the Lease for such uncured Lessee Event of Default . . . .

Id. at 50, Article 23.C.1.  Article 23.C.2 of the Lease states:

> In the event that Lessee is in default of Article 23.A.3 of this Lease for failure to pay Rent to the Department, and Lessee fails to cure the default in accordance with Article 23.B of this Lease, the Department may, notwithstanding Article 16 or any other provisions of this Lease, terminate this Lease for such uncured Lessee Event of Default . . . .

Id. at 51, Article 23.C.2.

**B.    VA Default Notices and Cure Letters**

Plaintiff has affirmed that, in accordance with the procedures outlined in Article 23 of the Lease, the VA sent numerous notices of default and requests to cure to FHSHA when FHSHA failed to perform its obligations under the Lease.  Id. at 640-703, Default Notice 1; 704-09, Default Notice 2; 710-25, Default Notice 3; 726-34, Default Notice 4; 741-50, 751-56, Requests to Cure.

On February 11, 2009, VA sent FHSHA a its first default notice demanding that, within thirty days, FHSHA remit in full the sum of $126,530.00.  This amount

12

represented the total amounts cited in five electric utility bills that the VA previously issued to FHSHA from September 28, 2006 through November 6, 2007, and one electric utility bill that the VA issued on September 22, 2008. The government attributed the $126,530.00 demand to Baltimore Gas & Electric utility services that were provided to, and thus benefitted, the leased premises, excluding the CBOC used by the VA. Id. at 640-703, Default Notice 1.

On February 27, 2009, in accordance with Article 7.E of the Lease, the VA sent FHSHA a Request for Information seeking information to help the VA determine FHSHA's compliance with Articles 24.Q.1, 10.A.2, 10.A.3, 14, and 31.A of the Lease. On that same date, in accordance with Article 7.E of the Lease, the VA sent FHSHA a Request for Information seeking information about deposits FHSHA was collecting from veterans.

On February 27, 2009, in accordance with Article 23.B of the Lease, the VA sent FHSHA a second default notice identifying that FHSHA was breaching its obligations and responsibilities under the following provisions of the Lease:

a.   Article 4.A.1 – FHSHA is failing to finance, develop and maintain the Project as required by Article 4.A.1 of the Lease.

b.   Article 4.A.7 – FHSHA is failing to operate, manage and maintain the Property as required by Article 4.A.7 of the Lease.

c.   Article 4.A.9 – FHSHA is failing to maintain and properly secure access to the Property as required by Article 4.A.9 of the Lease.

d.   Article 4.A.12 – FHSHA is failing to pay Rent as required by Article 4.A.12 of the Lease.

    e.      Article 4.D – FHSHA is failing to maintain and repair the Property as required by Article 4.D.

    f.      Article 6.C.8 – FHSHA has failed to provide VA unaudited income statements, balance sheets and cash flow statements within the time periods required by the Lease.  In addition, FHSHA failed to notify VA of the lawsuit filed against FHSHA by STV Incorporated.  Both of these actions are required by Article 6.C.8 of the Lease.

    g.      Article 12.B.1 – FHSHA is failing to manage, protect, preserve, maintain and repair the Property as required by Article 12.B.1 of the Lease.

    h.      Article 12.B.2 – FHSHA is failing to employ a local, designated representative for emergency management, protection, preservation, maintenance and repair as required by Article 12.B.2 of the Lease.

    i.      Article 13.A.1 and Article 13.A.4 – FHSHA has failed to maintain and deliver to VA a current certificate of insurance or a certified copy of each policy of insurance, as required by Article 13.A.1 and Article 13.A.4 and requested by VA on numerous occasions.

Id. at 704-09, Default Notice 2.  Default Notice 2 further stated:

> [I]n addition to remedying the aforementioned Lease breaches, FHSHA's failure to make progress, including its failure to obtain financing and begin construction of the Project, is endangering FHSHA's ability to complete Phase 1 of the Development Plan in the time required by the Lease. VA hereby demands assurances from FHSHA that it will complete Phase 1 of the Development Plan in accordance with the Lease, including construction and acceptance of the CBOC within thirty-nine (39) months of the Effective Date of the Lease . . . .

Id.  On March 3, 2009, the VA sent FHSHA a notice identifying several concerns:

> (i) FHSHA has failed to maintain the Property "in a good, clean and safe condition," (ii) make timely repairs, and (iii) properly secure the Property . . . . VA is concerned for the safety of the veterans accessing the Property and the protection of VA assets.  In accordance with Article 12.B.2 of the Lease, VA hereby notifies FHSHA that if substantial attempts to correct all deficiencies related to maintenance, repairs and security are not performed within thirty (30) days on all Parcels, VA will correct such deficiencies at the sole cost and expense of FHSHA . . . .

Id. at 759-64.  On March 10, 2009, the VA sent FHSHA a third default notice, which demanded that FHSHA remit to the VA $3,101.55.  Id. at 710-25, Default Notice 3.  The VA attributed this amount to certain Baltimore City water services and Baltimore County sewer services that were provided to, and thus benefitted, the portion of the Leased Premises, excluding the CBOC used by the VA.  Id.

On March 16, 2009, FHSHA responded to the VA's February 27, 2009 Default Notice 2.  The response did not indicate that FHSHA would begin curing any of the identified defaults, with the exception of identifying a contact person and providing the requested income statements.  The response did not provide assurances that the construction would be completed within the timelines set forth in the Lease.

On April 24, 2009, the VA sent FHSHA a fourth default notice for failure to respond to two Requests for Information sent to FHSHA on February 27, 2009.  Also on April 24, 2009, FHSHA sent a letter to the VA stating that FHSHA planned to respond to each of the letters from the VA on or before the end of May 2009.  On May 13, 2009, the VA sent a letter to FHSHA stating:

> [I]n accordance with Article 23.B of the Lease, FHSHA is required to cure the defaults identified in Default Notice 1 prior to May 18, 2009 and cure the defaults identified in the Default Notice 2 prior to June 2, 2009.  If FHSHA fails to cure the defaults identified in the Default Notices, VA intends to exercise VA's rights under the Lease, which includes, but is not limited to, termination of the Lease.

Id. at 735-40.

### C.    Termination of the Lease

On August 17, 2009 at 3:29 pm, the VA sent a Termination for Default Notice

("Termination Notice") to FHSHA via email and certified mail.  The effective date of the

termination was August 17, 2009.  Id. at 783-866.

The Termination Notice stated:

[FHSHA] was required to cure the defaults identified in Default Notice 1
prior to May 18, 2009 and cure the defaults identified in Default Notice 2
prior to June 2, 2009. VA notified FHSHA that if FHSHA failed to cure the
defaults identified in the Default Notices as required by the Lease and in the
time periods provided in the Lease and the Default Notices, that VA will
exercise VA's rights under the Lease, which includes, but is not limited to,
termination of the Lease.

Id.  The Termination Notice constituted the designated VA Representative's final

decision that the Lease is terminated in its entirety for the following reasons:

1.     The defaults identified in the Default Notices constitute a failure to
       pay Rent, as defined in the Lease. The failure to pay Rent is a
       material default.

2.     FHSHA's failure to maintain the Property and undertake the
       maintenance required by the Lease at the Property, as described in
       the Default Notices, are material breaches of the Lease and
       constitute a failure to pay Rent.

3.     FHSHA's failure to secure the Property, as described in Default
       Notice 2, is a material breach of the Lease and constitutes a failure to
       pay Rent.

4.     FHSHA's failure to maintain insurance on the Property, as described
       in Default Notice 2, is a material breach of the Lease and constitutes
       a failure to pay Rent.

5.     FHSHA's failure to pay for electrical utilities, as described in
       Default Notice 1, is a material breach of the Lease.

6.     FHSHA has taken no steps to begin the actual development or
       construction of the Project.  FHSHA did not respond to VA's request
       in Default Notice 2 that FHSHA provide assurances that FHSHA
       would complete Phase 1 of the Development Plan in accordance
       with the Lease, including construction and acceptance of the CBOC

within thirty-nine (39) months of the Effective Date of the Lease. To date (almost thirty-six (36) months after execution of the Lease), FHSHA has failed to obtain financing for the Project and no lender has been identified and confirmed that it is ready, willing, and able to provide FHSHA the requisite financing to enable FHSHA to construct the CBOC.  In addition, no plans have been submitted to VA or the County for review and approval.  Further, FHSHA has not started construction of the Project.  Accordingly, VA has determined that FHSHA will not be able to meet the deadline of thirty-nine (39) months after the Effective Date of the Lease (December 28, 2009) for construction of the CBOC in accordance with the Lease terms.

Id. at 786-87.

### D.    FHSHA's Obligations Regarding State and Local Approvals Under the Lease

As noted above, the lease provided that FHSHA was required to undertake the development in a manner that satisfied all requirements of "applicable" state and local laws, as required by Articles 4.A.1, 4.A.2, and 10.H.1 of the Lease.

FHSHA claims that while this was true, under the statutes governing EULs, 38 U.S.C. § 8166, local land use laws and regulations were not "applicable."  38 U.S.C. § 8166 provides:

(a) Unless the Secretary provides otherwise, the construction, alteration, repair, remodeling, or improvement of the property that is the subject of the lease shall be carried out so as to comply with all standards applicable to construction of Federal buildings.  Any such construction, alteration, repair, remodeling, or improvement shall not be subject to any State or local law relating to land use, building codes, permits, or inspections unless the Secretary provides otherwise.

38 U.S.C. § 8166.

Prior to execution of the Lease, the VA and FHSHA discussed the VA's expectation that FHSHA comply with all applicable state and local laws.  In response to a

question regarding larger issues negotiated in the Lease, Mr. Infantino, FHSHA's representative,[5] explained, "Obviously, the applicable word, the VA wanted to put in there that you comply with everything. We said, no, it's got to be applicable because we're not complying with certain local jurisdictions . . . but we resolved that by putting the word 'applicable' in." Def.'s App'x 891-92, Infantino Dep., 141:22-142:6, Jan. 23, 2014.

According to FHSHA, the VA accepted FHSHA's Development Plan which included the higher development density, development program, master plan, budgets, and economic consideration all based on 1,300 units, although County land use regulations would apparently allow a 550 unit density.

Although Baltimore County never rejected FHSHA's proposed 1,300 units as FHSHA never applied for a zoning variance, it is not disputed that 1,300 was not consistent with the Baltimore County land use regulations in place at the time.

### E.    FHSHA's Obligation Regarding Financing

FHSHA sought financing from Starwood Capital, who participated in Lease negotiations with the VA and FHSHA prior to the execution of the Lease. Id. at 884-85, Infantino Dep., 71:21-72:3, Jan. 23, 2014.

The VA participated in multiple meetings with FHSHA's potential lenders. In response to a question if the VA participated in any meetings with FHSHA's potential lenders, Mr. Infantino explained, "Absolutely. They were there for the HUD and GMAC

---

[5] Mr. Infantino is the chief executive manager of Ft. Howard Senior Housing Associates, LLC.

lending meetings…and they absolutely participated with Starwood . . . GMAC was probably two, three meetings . . . .  I would have to guesstimate it was somewhere between 5 to 15 [meetings with Starwood].  It's a pretty wide range, but it extended over a long period of time.  Enough to generate $700,000 in legal fees . . .  [With Enterprise,] we definitely had conference calls, and I'd say probably three to five conference calls, a series of e-mail exchanges, and we might have had one or two meetings . . . ."  <u>Id.</u> at 919-20, Infantino Dep., 240:5-241:19, Jan. 23, 2014.

### F.      Application of the Davis-Bacon Act

Prior to execution of the Lease, FHSHA and the VA discussed that the Davis-Bacon Act may apply to FHSHA's activities.[6]  Mr. Infantino explained, "[W]e told the VA during the process that Davis-Bacon doesn't apply to the buildings we built, and they said they don't know about that. They are not sure about that . . . ."  <u>Id.</u> at 912-13, Infantino Dep., 193:18-194:2, Jan. 23, 2014.

To resolve this ambiguity, Article 33 of the Lease was drafted to require compliance with the Davis-Bacon Act unless FHSHA obtained a written determination or written correspondence from the U.S. Department of Labor ("DOL") that the Lease or the Project is exempt therefrom.  <u>Id.</u> at 64, Article 33; <u>id.</u> at 891, Infantino Dep., 141:18-20, Jan. 23, 2014.

---

[6] The Davis-Bacon Act sets standards for the pay of laborers and mechanics for federal contracts, and in particular requires that workers be paid a minimum wage determined in reference to the prevailing local rate.  40 U.S.C. §§ 3141-3142.

The VA remained neutral on the applicability of the Davis-Bacon Act to the

Project, as the VA believed that the DOL, and not the VA, was the appropriate party to

determine the applicability of this statute to the project.  After FHSHA signed the Lease,

FHSHA sought a waiver of the Davis-Bacon Act; however, on June 5, 2008, FHSHA

informed the VA that it would no longer be seeking the waiver.  Id. at 867, Email from

John Infantino to Erik Wishneff & Alan Hackman (June 5, 2008, 01:40 EST) ("This

email confirms that there is no reason to cont[i]nue dialogue with Department of labor at

this time.  We will not be seeking an immediate decision on this issue.").

## II.   DISCUSSION

### A.   Standard of Review for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

RCFC 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty

Lobby, Inc. v. United States, 477 U.S. 242, 247 (1986).  In order to defeat a motion for

summary judgment, the nonmoving party must point to "'specific facts showing that there

is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The nonmoving party must "establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at

322.  "A genuine dispute is shown to exist if sufficient evidence is presented such that a

reasonable fact finder could decide the question in favor of the non-moving party."

Opryland USA Inc. v. Great American Music Show, Inc., 970 F.2d 847, 850 (Fed. Cir.

1992) (citing Anderson, 477 U.S. at 248).  However, to the extent that actual evidence is

presented, "the evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

**B.    The Legal Standards Governing Terminations for Default and For Establishing That A Default is "Excused"**

In reviewing a termination for default, the court must "strike a balance between

the judicial aversion to default terminations . . . and the fact that 'the Government, just as

any other party, is entitled to receive that for which it has contracted and the right to

accept only goods that conform to the specification.'" McDonnell Douglas Corp. v.

United States, 323 F.3d 1006, 1015 (Fed. Cir. 2003) (quoting Cascade Pac. Int'l v. United

States, 773 F.2d 287, 291 (Fed. Cir. 1985)) (citing J.D. Hedin Constr. Co. v. United

States, 187 Ct. Cl. 45 (1969)).  When a contractor challenges a default termination, the

government bears the burden of establishing the validity of the termination.  Lisbon

Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987).  These "principles

apply with equal force where the Government has terminated a lease." Moreland Corp.

v. United States, 76 Fed. Cl. 268, 284 (2007) (citation omitted).  Where, as here, the

termination for default regarding construction of the CBOC involves the failure to

perform the work, the government must establish that there was "a reasonable belief on

the part of the contracting officer that there was 'no reasonable likelihood that the

[contractor] could perform the entire contract effort within the time remaining for

contract performance.'" Lisbon, 828 F.2d at 765 (quoting RFI Shield-Rooms, ASBCA

Nos. 17374, 17991, 77-2 BCA (CCH) ¶ 12,714, 61,735) (citing Discount Co. v. United

States, 554 F.2d 435, 441 (Ct. Cl. 1977), cert. denied, 434 U.S. 938 (1977)).

Even if the government sustains its burden of showing a proper termination for default, the termination will be converted to a termination for convenience only if the delay was "excusable" under the terms of the default provision of the contract. Sauer Inc. v. Sec'y of the Navy, 224 F.3d 1340, 1345 (Fed. Cir. 2000). In addition, a contractor's failure to perform will be excused and the termination for default converted to a termination for convenience if the contractor can establish that the government materially breached the contract. See Murdock Mach. & Engineering Co. of Utah v. United States, 873 F.2d 1410, 1413 (Fed. Cir. 1989) (citing Malone v. United States, 849 F.2d 1441, 1446 (Fed. Cir. 1988)).

Tested by these standards, the court now turns to the questions of whether the government's decision to terminate the Lease for default was justified and if so whether, as the government argues, the plaintiff's claims of "excuse" fail as a matter of law.

### C.   The Termination for Default Regarding Construction of the CBOC

The following facts are not disputed. FHSHA did not begin construction of the CBOC by the time that the termination for default was issued. Under the terms of the Lease, failing to construct the CBOC in accordance with the Lease terms would be grounds for default unless the time for constructing the CBOC was extended by agreement or due to a force majeure event. However, it is undisputed that the time for constructing the CBOC was not extended by agreement. Further, it is also undisputed that when the VA, in accordance with the Lease, sent a cure letter to FHSHA on May 13, 2009 asking FHSHA to provide assurances that it could comply with Lease and construct the CBOC in accordance with the Lease terms, FHSHA failed to respond by the date

provided. When the VA had not heard from FHSHA, it began its initial steps to terminate the Lease for default. Finally, it is not disputed that, although FHSHA responded to some of the VA's concerns in a letter it sent to the VA on August 17, 2009, FHSHA did not commit to constructing the CBOC in accordance with the schedule set forth in the Lease and the notice of termination for default was sent on that same day.

In light of these undisputed facts, the court finds that the termination for default based on FHSHA's failure to timely construct the CBOC was justified under the terms of the Lease. Under the undisputed facts as laid out above, FHSHA was unable to construct the CBOC by the date required by the Lease. Indeed, FHSHA had not begun construction. Accordingly, unless, as FHSHA argues, there are disputed issues of fact which if proven would establish that FHSHA's failure to perform was excused by a force majeure event,[7] as provided for in the Lease or by a material breach of the lease by the VA, it will be affirmed.

**1.    As a Matter of Law, the VA Did Not Breach Its Duty to Cooperate or Violate Any Implied Warranties by Requiring Compliance with State and Local Land Use Laws and Taxes.**

FHSHA contends that the VA breached its duty to cooperate and violated implied warranties in two ways: (1) by requiring FHSHA to comply with state and local land use and construction requirements and state and local taxes, and (2) by then failing to assist FHSHA to resolve issues that arose out of FHSHA's obligations to comply with local

---

[7] At oral argument, counsel for plaintiff conceded that, if there was no force majeure event, then there is no dispute that FHSHA materially breached the lease.

zoning laws.  According to plaintiff, these actions excuse its failure to begin construction

on the CBOC.  Plaintiff recognizes that the Lease states that FHSHA would comply with

"applicable local and State laws, codes and ordinances," but argues that the Federal

government's exemption from such laws means that none of the state or local

requirements or taxes are "applicable."

The government argues that it did not breach its duty to cooperate or violate any

implied warranties because the VA, in the terms of the Lease, exercised its statutory

authority to require such compliance.  The government argues that the version of 38

U.S.C. § 8166(a)[8] in effect at the time the parties entered into the Lease gave the VA the

"discretion" to require a lessee that enters into an EUL to comply with state or local

requirements relating to land use, building codes, permits or inspections and thus the VA

was entitled to require compliance with state and local laws and regulations.

Specifically, the government relies on the second sentence of § 8166(a), contending that

it expressly states that any construction, alteration, repair, remodeling, or improvement"

is not subject to state or local "land use, building codes**,** permits, or inspections <u>unless the

Secretary provides otherwise</u>."  38 U.S.C. § 8166(a) (emphasis added).  The government

---

[8] The version of 38 U.S.C. § 8166(a) in effect at the time the parties entered into the Lease states:

> Unless the Secretary provides otherwise, the construction, alteration, repair,
> remodeling, or improvement of the property that is the subject of the lease shall be
> carried out so at to comply with all standards applicable to construction of Federal
> Buildings.  Any such construction, alteration, repair, remodeling, or improvement
> shall not be subject to any State or local law relating to land use, building codes,
> permits, or inspections unless the Secretary provides otherwise.

38 U.S.C. § 8166(a) (2004).

argues that the Lease by its terms demonstrates that the Secretary of the VA did not

exempt FHSHA from complying with state and local laws, instead stating in Articles

4.A.1, 4.A.2, and 10.H.1 that FHSHA is subject to all applicable laws.  According to the

government, "applicable" laws include the local Baltimore County zoning requirements.

The court agrees with the government.  While the VA does have discretion under

38 U.S.C. § 8166(a) to determine whether it must comply with state and local law, it is

clear that the VA required compliance under the terms of the Lease.  The Lease states:

> Lessee hereby agrees to the following, all of which shall constitute fair
> consideration for this Lease:
>
> 1. Finance, design, develop, construct, demolish, alter, operate, maintain,
> repair, replace, sublease, improve, renovate and market the Property into the
> "Project" in accordance with this Lease (including but not limited to Article
> 10 hereof), all applicable local and State laws, codes and ordinances, and the
> National Fire Protection Association ("NFPA") 101 Line Safety Code.
>
> 2. During the Term of the Lease: (i) obtain all applicable local and State
> permits, licenses, and approvals (including those approvals of VA) necessary
> for construction and operation of the Permitted Uses; . . .

Def.'s App'x 10, Articles 4.A.1, 4.A.2.  Plaintiff argues that the use of "applicable"

allows FHSHA to avoid compliance: as § 8166 generally exempts the government, none

of the laws are applicable.  However, such a reading of the Lease would render these

terms mere surplussage, which is disfavored.  E.g. Metric Constructors, Inc. v. Nat'l

Aeronautics & Space Admin., 169 F.3d 747, 753 (Fed. Cir. 1999) ("Courts prefer, for

example, an interpretation of a contract that gives effect to all its terms and leaves no

provision meaningless." (citing United States v. Johnson Controls, Inc., 713 F.2d 1541,

1555 (Fed. Cir. 1983))).  Instead, it is clear that these terms unambiguously state that

state and local laws are relevant to the project.  Plaintiff's contention that "applicable" should be read to mean "none" is simply inconsistent with the plain language of the lease and must be rejected.  Accordingly, the VA's later insistence that FHSHA comply with state and local laws was not a breach of the lease, but rather entirely consistent with it.

In addition, contrary to FHSHA's contention, nothing in 38 U.S.C. § 8167 suggests that the VA breached any duty in connection with state and local tax obligations under the Lease.  Under 38 U.S.C. § 8167, the United States' interest in and use of the property "shall not be subject . . . to any State or local laws relative to taxation, fees, assessments, or special assessments, except that sales taxes [shall be] charged in connection with any construction, alteration, repair, remodeling or improvement project carried out under the lease."  38 U.S.C. § 8167 (1991).  This exemption, however, did not extend to FHSHA's interest in the property.  The Lease expressly required that FHSHA

> pay and discharge, . . . prior to delinquency, all taxes, general and special assessments, and other charges of every description that during the term of this Lease may be levied or assessed against the Property and all interests therein and all improvements and other property thereon, whether belonging to [the VA] or the Lessee.

Def.'s App'x 44, Article 17.B.  Accordingly, if a state or local government imposed taxes on FHSHA's interest in the property, FHSHA was obligated to pay such taxes and the VA did not have the power under § 8167 to exempt FHSHA from paying state or local taxes.

Given the plain language of the subject Lease provisions, the court finds as a matter of law that the VA did not breach a duty of good faith and fair dealing or violate any implied warranties when it (1) required in the Lease that FHSHA comply with state

and local land use, building code, permit, and inspection laws, notwithstanding that 38

U.S.C. § 8166(a) permitted the VA to exempt itself from those requirements; or (2)

declined to interpret 38 U.S.C. § 8167 to permit the VA to exempt FHSHA from paying

state and local taxes.  In such circumstances, the VA did not have an obligation to work

with FHSHA to help FHSHA avoid its legal obligations.  Plaintiff has provided no legal

basis for this court to find that the parties' agreement to cooperate required the VA to

assist FHSHA in avoiding its responsibilities under the terms of the Lease.  For those

reasons, the court finds that the VA acted in accordance with its rights under the law and

did not breach the Lease.

### 2. The VA Did Not Breach the Lease by Concluding that Baltimore County Zoning Rules Were "Applicable" Under the Lease.

FHSHA further contends that the VA breached its Lease with FHSHA by

requiring compliance with state and local laws that limited development to 550 units

because the VA knew that if FHSHA had to comply with all local land use rules it would

not be able to build the 1,300 units identified in the Development Plan attached to the

Lease.  FSHSA argues that, by approving the Development Plan, the VA must not have

intended that Baltimore County's 550-unit limit was an "applicable" requirement under

the Lease.

The government argues that FHSHA's argument fails as a matter of law because

the term "applicable" in Article 4.A.2 of the Lease plainly meant that FHSHA would be

required to comply with all of state and local rules that "apply" to the Project, and

nothing in the Lease suggested that Baltimore County's density zoning rules were not

"applicable."  With regard to FHSHA's contention that the VA would not have intended to make a 550-unit local zoning limit "applicable," the government argues that, by its terms, the Lease took precedence over the Development Plan.[9]  Moreover, the government argues that both the Lease and the Development Plan state that "FHSHA will obtain all applicable local and State permits, licenses, and approvals (including those approvals of VA) necessary for construction and operation."  Def.'s App'x 10, Article 4.A.2; id. at 93, Development Plan.

As noted above, the court agrees with the government that the Lease is not ambiguous with regard to the use of "applicable."  There is no dispute that the housing project was to be built in Baltimore County.  In such circumstances, because the project was in Baltimore County, Baltimore County's zoning rules were applicable and therefore FHSHA was required to comply with them.  There is nothing in the Lease or Development Plan that puts this reading of the Lease into question.  Thus, the VA did not, as a matter of law, breach the lease by requiring FHSHA to comply with local zoning laws with regard to the density limit on housing units.

To the extent that FHSHA contends that the VA breached the contract by failing to disclose or discuss Baltimore County's density limit in advance of FHSHA signing the

---

[9] Specifically, the government refers to Article 24.H, which states in relevant part:

> All Exhibits attached to [the] Lease are fully a part of [the] Lease.  In the event of a conflict in interpretation of provisions of [the] Lease between the Development Plan at Exhibit E of [the] Lease, and Articles 1-31 or any other Exhibit of [the] Lease, Articles 1-31 or any other Exhibit of [the] Lease shall control.

Def.'s App'x 54, Article 24.H.

Lease, the argument also fails as a matter of law.  The government acknowledges that under the "superior knowledge" doctrine it could be liable for a breach if "the government owes a duty to disclose critical information to a contractor that is necessary to prevent the contractor from unknowingly pursuing a ruinous course of action." McDonnell, 323 F.3d at 1020 (quoting McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1329 (Fed. Cir. 1999) (internal quotation marks omitted)).  FHSHA, however, fails to provide any factual support for its allegations that the VA knew in advance of signing the Lease with FHSHA that Baltimore County had zoning restrictions which would have limited the number of units that could have built on the site.  To the contrary, the undisputed evidence shows that the VA did not learn about Baltimore County's zoning restrictions until FHSHA informed the VA after the Lease was signed.  Def.'s Supp. App'x 1253, Hackman Decl. ¶ 14.  In such circumstances, the VA lacked the knowledge necessary to create a duty and FHSHA's claim of breach based on a "superior knowledge" claim also fails as a matter of law.

### 3. FHSHA's Various Force Majeure Claims Fail As a Matter of Law.

Under the Force Majeure Clause of the Lease, FHSHA's delay in completing the CBOC could be excused

> if [a]ny of the following that directly cause any of Lessee's obligations hereunder not to be performed in a timely manner: (1) an earthquake, hurricane, tornado, flood, or other similar act of God; (2) fire; (3) strikes or similar labor disputes provided such strike or similar dispute is beyond Lessee's control and provided Lessee takes all steps reasonably possible to remediate such strike or similar dispute; (4) acts of the public enemy; (5) inability to obtain labor or materials or clear access to the Project or unreasonable delay in approving permit applications for the Project by

reason of acts or omissions of any governmental body not caused by
Lessee's actions or omissions; (6) rebellions, riots, insurrections or civil
unrest; (7) unusually severe weather conditions that actually cause similar
construction or development activities in the area of the Project to be
suspended; or (8) an unknown environmental hazard or unknown hazardous
substance (e.g., one that Lessee did not know of or have notice of by the
Effective Date) affecting the Property.

Def.'s App'x 5, Article 1 (emphasis added).  FHSHA contends that various governmental

bodies delayed processing certain of FHSHA's applications, agreements, and related

documents and that, pursuant to the force majeure provisions in the Lease, these delays

excuse FHSHA's failure to complete the CBOC on time.

Specifically, FHSHA contends that (1) the VA delayed in assisting FHSHA to

secure an opinion letter from the DOL as to the applicability of Davis-Bacon wages with

regard to its employees at the site, and (2) Baltimore County, the Maryland State Historic

Preservation Office, and the VA failed to act promptly on the applications FHSHA

submitted to these organizations in connection with this project.  The government

contends that none of the delays identified by FHSHA constitute a force majeure event.

For the reasons that follow, the court agrees.

> **a.   VA and DOL's Actions with Respect to the Davis-Bacon
> Act Did Not Excuse FHSHA's Failure to Timely Perform
> Under the Force Majeure Provisions of the Lease.**

Regarding Davis-Bacon wage requirements, FHSHA is unable to demonstrate that

any of the VA's or DOL's actions in connection with FHSHA's effort to waive such

requirements amounts to a force majeure event.  First, Subsection 3 of the definition

states that a force majeure event includes "strikes or similar labor disputes provided such

strike or similar dispute is beyond Lessee's control and provided Lessee takes all steps

reasonably possible to remediate such strike or similar dispute." Def.'s App'x 4, Article

1.  However, FHSHA has not presented any evidence to show that there were any strikes

or similar labor disputes that prevented FHSHA from constructing the CBOC in a timely

fashion.

Second, FHSHA's allegations regarding VA's failure to help FHSHA from

obtaining an opinion letter from DOL as to the applicability of the Davis-Bacon Act do

not constitute a force majeure event.  The Lease expressly provides that the Davis-Bacon

Act is applicable to FHSHA's construction on the Fort Howard site unless FHSHA

obtains an exemption.  The Lease provides:

> [u]nless the Lessee can demonstrate to the satisfaction of the Department in
> the form of a written determination or written correspondence from the U.S.
> Department of Labor that the Lease or the Project is exempt therefrom,
> Lessee shall comply with the requirements of the Davis-Bacon Act, as
> amended, 40 U.S.C. Section 3141 et. seq. and the relevant rules, regulations
> and orders of the Secretary of Labor applicable thereto.

Id. at 64, Article 33.

The VA told FHSHA prior to finalizing the Lease that the VA was unsure as to

whether DOL would grant a waiver.  Id. at 912-13, Infantino Dep. 193:18-194:2, Jan. 23,

2014.  Thus, FHSHA took the risk that it might not receive a waiver when it signed the

Lease.  Moreover, FHSHA informed the VA that, as of June 5, 2008, it would no longer

seek a waiver from the Davis-Bacon requirements.  Id. at 867, Email from John Infantino

to Erik Wishneff & Alan Hackman (June 5, 2008, 01:40 EST) ("This email confirms that

there is no reason to cont[i]nue dialogue with Department of labor at this time.  We will

not be seeking an immediate decision on this issue.").

Finally, there is no evidence showing that any delay related to Davis-Bacon requirements interfered with FHSHA's ability to complete the CBOC by the date required in the Lease.  For all of these reasons, there is no basis for the court to find that the VA and DOL's actions regarding Davis-Bacon Act compliance could as a matter of law excuse FHSHA's failure to meets its obligations with regard to the CBOC.

> **b.** **FHSHA Is Unable To Establish That The Timing Of The VA's And The State And Local Government's Responses To FHSHA's Applications Constituted <u>Force Majeure</u> Events.**

Regarding prompt responses from the VA and state and and local governments, FHSHA contends that the failure of the VA and various state and local governmental bodies to act timely with regard to FHSHA's submissions constituted <u>force majeure</u> events under the definition of <u>force majeure</u> the Lease.  In response, the government argues that the undisputed facts establish that none of the actions by the VA or state and local governments actually prevented FHSHA from moving forward with its responsibilities under the Lease.

First, FHSHA argues that the VA delayed its actions by failing to timely approve changes to construction plans.  The government correctly argues that this argument fails as a matter of law.  Under Article 10.A.3 of the Lease, FHSHA was authorized to proceed with any construction plan changes if the VA failed to act within 20 days of FHSHA's submission of a request for changes.[10]  In such circumstances, FHSHA cannot

---

[10] The Lease provides:

> VA's failure to respond within twenty (20) business days to such submission of any plat, plan, specification or application (or, if the response is disapproval, to

32

show that the VA unreasonably delayed FHSHA by failing to approve changes to the construction plans.[11]

Second, FHSHA argues that delays in the approval of the Programmatic Agreement—which was made between FHSHA, the State of Maryland Historic Preservation Office, and VA—also amounted to a force majeure event that should excuse FHSHA's failure to timely construct the CBOC.  Again, FHSHA's argument fails as a matter of law.

The Lease provides that the Lessee and VA were required to comply with the provisions of the National Historic Preservation Act and the Archeological Resources Protection Act, 16 U.S.C. §§ 470-470mm ("NHPA and ARPA"), and to abide by any agreements the parties entered into with respect to NHPA and ARPA either prior to or during the terms of the Lease.  Def.'s App'x 20, Article 6.C.5.  The parties' undisputed

---

identify the defects with such specificity that Lessee can correct them) shall be deemed unreasonable for purposes of this Article 10.A and the Department's consent thereto shall be deemed given.

Def.'s App'x 24, Article 10.A.3.

[11] In his affidavit and declaration attached to plaintiff's response, Mr. Infantino made several allegations regarding the VA's conduct: (1) that the VA failed to provide a legal description for the CBOC site; (2) that the VA failed to approve an Updated Schematic CBOC Plan, Design/Build Process Agreement, or Final Schematic CBOC Plan in writing; (3) that the VA refused to amend the CBOC plan to be within the 10,000 ground square feet standard in the Lease; (4) that the VA did not consider or approve requests to relocate the CBOC; and (5) that the VA failed to provide a scaled-down program necessary to prepare a Final Schematic CBOC Plan.  Pl.'s Am. Mot. for Summ. J., Ex. B, Infantino Aff. ¶¶ 28-37; id., Ex. D, Infantino Supp. Aff. ¶¶ 23-35.  In addition to the provisions of the Lease allowing FHSHA to consider submissions to be approved by the VA after 20 days, the court finds that plaintiff has provided no support for the allegations in those declarations.  Such uncorroborated statements cannot defeat a motion for summary judgment.  Impresa Construzioni Geom. Domenico Garufi v. United States, 61 Fed. Cl. 175, 181 (2004) (citations omitted).

facts show that the government representatives had negotiated a draft Programmatic

Agreement pursuant to 16 U.S.C. § 470, and were prepared to sign the agreement, but

FHSHA did not sign the Agreement.  Def.'s Supp. App'x 1253, Hackman Decl. ¶¶ 16-

19.  Rather, on January 6, 2009, after the VA had sent a copy of the Agreement to

FHSHA, the VA received a question from FHSHA[12] which appears to have been

previously answered by the VA on June 27, 2008.[13]  For whatever reason, however,

FHSHA never executed the Programmatic Agreement, and thus it was not executed.  Id.

Because the undisputed evidence shows that FHSHA contributed to any delay by failing

to sign the Agreement, FHSHA cannot establish that the government's delay was a force

majeure event under the terms of the Lease.  Under the Lease, a qualifying unreasonable

delay could not be "caused by Lessee's actions or omissions," Def.'s App'x 5, Article 1,

and therefore FHSHA's contribution to the delay prevents it from constituting a force

---

[12] On January 6, 2009, Mr. Erik Wishneff of Federal Development sent an email to Mr. Alan Hackman, VA, to ask whether, "if the PA was terminated that it would not trigger a default under the Lease and that [FHSHA] would simply have to go through the statutory Section 106 process."  Def.'s Supp. App'x 1195, Email from Erik Wishneff to Alan Hackman & John Infantino (Jan. 6, 2009, 15:05 EST).

[13] On June 27, 2008, Mr. Hackman responded to Mr. Wishneff's June 23, 2008 email message:

> You have asked for clarification as to whether VA would consider FHSHA in default of the EUL if a party terminates the PA.  We do not believe that VA would find FHSHA in default of the EUL because the PA is terminated by a party. Should the PA be terminated by a party, VA would, in that event, expect FHSHA to comply with Section 106 of the NHPA.  While the PA is effective, however, FHSHA would be required to comply with the PA terms in accordance with Article 6.C.5 of the EUL.

Def.'s Supp. App'x 1165, Email from Alan Hackman to Erik Wishneff & James Wagner (June 27, 2008, 12:06 EST).

majeure event.

Third, FHSHA argues that Baltimore County's failure to approve the Entitlement Memorandum of Understanding ("Entitlement MOU")[14] that it submitted in 2006 asking for an exemption from county jurisdiction over development of the Fort Howard site was a force majeure event.  According to FHSHA, the county delayed taking any action on the Entitlement MOU until the State of Maryland adopted statewide legislation addressing federal EUL and base realignment and closure projects.  FHSHA further contends that, because state and federal agencies took such a long time to address FHSHA's applications and documents in connection with the Entitlement MOU, the VA should have afforded FHSHA additional time to complete its work.

The government argues that FHSHA cannot establish a force majeure event based on Baltimore County's failure to waive its jurisdiction over the Project because FHSHA was required under the Lease to comply with County requirements or seek a modification of the requirements.  Here, the government argues, it is undisputed that FHSHA never submitted a formal permit application to Baltimore County requesting approval for 1,300 units or otherwise asking the County to modify the zoning restrictions that limited to 550 the number of units that could be built at the Fort Howard site.

The court again agrees with the government.  As an initial matter, as discussed above, the Lease clearly states that FHSHA itself was required to take the necessary steps

---

[14] FHSHA had submitted an Entitlement MOU to Baltimore County that provided the County only with review authority over the Ft. Howard project.  Pl.'s Am. Mot. for Summ. J., Ex. B, Infantino Aff. ¶ 84.

to "obtain all applicable local and State permits, licensees, and approvals . . . necessary for construction and operation of the Permitted Uses [of the Fort Howard site]."  Def.'s App'x 10, Article 4.A.2.  As this responsibility rested solely with FHSHA, the County's refusal to waive jurisdiction cannot be a <u>force majeure</u> event, as it is "caused by Lessee's actions or omissions."  <u>Id.</u> at 5, Article 1.

In this connection, however, it is important to note that while FHSHA needed a waiver of County requirements in order to build the desired number of housing units, it is undisputed that FHSHA did not need County approval to build the CBOC because it was a "federal" building to which no state or local zoning restrictions applied.  <u>See id.</u> at 26, Article 10.H.1.  There is no evidence that the state or local government failed to act with regard to any request in connection with construction of the CBOC.  Accordingly, the court must reject FHSHA's contention that it could not build the CBOC unless it obtained an exemption from all local requirements from Baltimore County.  FHSHA argues that the uncertainties regarding the housing units prevented it from being able to construct the CBOC because its financing was based on building 1,300 units.  However, the Lease plainly provided that FHSHA had 39 months to build the CBOC and thus it had over 3 years to deal with the County and the VA to work out issues regarding the CBOC.  The fact that FHSHA elected to seek an exemption from County rules rather than to seek a variance from them is, as discussed above, a risk that FHSHA alone bore under the

Lease.[15]  The County's decision not to exempt FHSHA from local zoning requirements and any delay in making that decision is not a <u>force majeure</u> event that prevented construction of the CBOC.

### 4. VA Did Not Breach Its Duty Of Good Faith And Fair Dealing By Failing To Discuss Possible Lease Modifications With Potential Lenders After The Parties Signed The Lease.

FHSHA next contends that the VA breached its duty of good faith and fair dealing by refusing to discuss possible lease modifications with lenders after the Lease was signed.  The government argues that this argument fails because the Lease expressly provides that VA is not required to accept a proposed modification which "in any way affect[s] the Term or the rent [or] affect[s] adversely in any material respect any rights of the Department under [the] Lease."  Def.'s App'x 44, Article 16.C.11.

There is no dispute that the VA made construction of the CBOC a material term of the Lease.  As a matter of law, the government could not breach the duty of good faith and fair dealing on the grounds that the government refused to eliminate or change the CBOC identified in the Lease after FHSHA learned that it would have to comply with local zoning rules for the housing units.

### 5. FHSHA Is Unable To Establish That It Is Entitled to Reformation of the Lease Based on Mutual Mistake.

FHSHA next argues that its failure to construct the CBOC should be excused because the parties were mutually mistaken regarding two facts underlying their Lease.

---

[15] FHSHA agrees that it did not "undertake local zoning," the process of obtaining a local zoning variance.  Pl.'s Am. Mot. for Summ. J., Ex. B, Infantino Aff. ¶ 98.  According to Mr. Infantino, "the process to undertake local zoning could have lasted years . . . ."  <u>Id.</u>

First, FHSHA argues that the parties were mutually mistaken in their belief that the County would approve FHSHA's construction of 1,300 housing units at Fort Howard under the Lease.  Second, FHSHA argues that the parties were mutually mistaken in their understanding that "Baltimore County [would] not have authority to issue permits but [would] be given [only] a courtesy review of site plans."  Compl. ¶ 67.

> To establish a mutual mistake of fact, FHSHA must show:
>
> (1) the parties to the contract were mistaken in their belief regarding a fact;
> (2) that mistaken belief constituted a basic assumption underlying the contract;
> (3) the mistake had a material effect on the bargain; and
> (4) the contract did not put the risk of the mistake on the party seeking reformation.

Dairyland Power Co-op v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990)).  The government argues that FHSHA was obligated to comply with Baltimore County density requirements and thus bore the risk of the County not approving the construction of 1,300 units at the Fort Howard site.  In such circumstances, the government argues, FHSHA cannot rely on reformation of the Lease as a basis for finding that its failure to construct the CBOC was excused.

The court agrees with the government.  As discussed above, although the Development Plan provided that FHSHA intended to build 1,300 units, the Lease expressly provided that the Lease, not the Development Plan, controlled and stated that the VA did not represent or warrant that the Fort Howard site would be suitable for any particular purpose.  Def.'s App'x 54, Article 24.H.  Thus, the Development Plan's

statement that the proposed site was in keeping with Baltimore County's intent for the area is not relevant.  Because, as discussed above, the Lease required FHSHA to comply with state and local requirements associated with the development and construction of the project, FHSHA was required to obtain county approval to build the full 1,300 units, and thus assumed the risk that it would not be able to obtain such approval when it signed the Lease.  Accordingly, there was no mutual mistake.  In such circumstances, the court finds that FHSHA cannot establish that it is legally entitled to reformation of the Lease.

> **6.    FHSHA Cannot Establish that Performance Under The Lease Was Either Impossible Or Commercially Impracticable As A Matter of Law.**

As discussed throughout this opinion, at the heart of FHSHA's defense to the termination of default is its contention that it was economically impossible to meet its obligations under the Lease unless it was permitted to construct 1,300 housing units on the Fort Howard site.  According to FHSHA, 550 total housing units would not generate a sufficient income stream to begin construction or satisfy other Lease obligations, while 1,300 housing units would.  FHSHA therefore argues that its failure to construct the CBOC must be excused as impracticable.  The government argues in response that plaintiff has failed to carry its burden of introducing disputed facts to show impossibility or impracticability and thus its argument fails as a matter of law.

The doctrines of impossibility and impracticability "have merged over time, as courts have construed the term 'impossibility' to include 'impracticability.'"  Short Bros., PLC v. United States, 65 Fed. Cl. 695, 782-83 (2005) (citing Seaboard Lumber Co. v.

United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002)).  The Supreme Court has

reformulated the common law doctrine of impossibility as follows:

> [W]here, after a contract is made, a party's performance is made
> impracticable without his fault by the occurrence of an event the non-
> occurrence of which was a basic assumption on which the contract was
> made, his duty to render that performance is discharged, unless the
> language or the circumstances indicate the contrary.

United States v. Winstar Corp., 518 U.S. 839, 904 (1996) (quoting Restatement (Second)

of Contracts § 261 (1981)).  For a plaintiff to prevail upon a defense of impossibility, the

plaintiff must "show that (i) a supervening event made performance impracticable; (ii)

the non-occurrence of the event was a basic assumption upon which the contract was

based; (iii) the occurrence of the event was not [the plaintiff's] fault; and (iv) [the

plaintiff] did not assume the risk of occurrence."  Seaboard, 308 F.3d at 1294 (citation

omitted).

Essentially, "[t]he Restatement requires plaintiff to show that the cause of the

impracticability was a fact, the non-existence of which was a basic assumption of the

contract."  Short, 65 Fed. Cl. at 785.  This assumes that "the parties will have bargained

with respect to any risks that are both within their contemplation and central to the

substance of the contract."  Winstar, 518 U.S. at 905.  "[N]o impossibility defense will lie

where the 'language or the circumstances' indicate allocation of the risk to the party

seeking discharge."  Seaboard, 308 F.3d at 1295 (citations omitted).  For example, a

contractor that enters into a fixed-price contract for the purchase of timber bears the risk

that the market price will drop.  Id.  Under such circumstances, "because the non-

occurrence of a market slump was not a basic assumption of both parties and [the

contractor] bore the risk, [the contractor's] impossibility defense fails as a matter of law." Id.

The government argues that FHSHA's commercial impracticability defense fails as a matter of law because FHSHA assumed the risk of occurrence.  See Seaboard, 308 F.3d at 1295.  As discussed above, the court agrees that the Lease required FHSHA to obtain Baltimore County's approval for the development of the property.  If FHSHA knew that it would have to construct 1,300 units rather than 550 units to make the Lease viable, FHSHA was required at a minimum to try to get permission from the County to build more than 550 units.  The undisputed facts show, however, that FHSHA never sought a variance from Baltimore County.  To the contrary, FHSHA decided not to seek a variance, but instead sought only an exemption from local land use rules.  See supra n. 15.  A request for an exemption is not the same as seeking to comply with local land use requirements through the variance process or otherwise.  Because FHSHA bore the risk under the Lease for complying with Baltimore County's density requirements and failed to even attempt to comply with Baltimore County's zoning code, it cannot show that its failure to construct the CBOC should be excused because it could not finance the project.  FHSHA simply failed to fulfill its obligations under the Lease.  As such, the court finds that FHSHA's impossibility defense fails as a matter of law.[16]

---

[16] The final count in FHSHA's amended complaint seeks compensation for "Tortious Interference with Contractual Relations and Prospective Economic Advantages."  Compl. Count VI.  FHSHA contends that "VA had a contractual relationship with FHSHA, with the probability of future economic benefit to FHSHA, and breached such contract in the manners set forth above."  Compl. ¶ 81.  FHSHA contends that the VA's decision to terminate the Lease is a breach of contract and therefore is improper, arbitrary, capricious, and an abuse of discretion.

III.    **CONCLUSION**

For the foregoing reasons, the government's motion for summary judgment is

**GRANTED**.  The parties shall file a joint status report by **July 6, 2015** setting forth a

schedule for resolving the government's counterclaim, which is now the sole remaining

issue in this case.

**IT IS SO ORDERED.**


s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

Compl . ¶¶ 50, 57, 63, 74, 79.  While this court typically lacks jurisdiction over cases sounding in tort, 28 U.S.C. § 1491(a), claims are within its jurisdiction where they arise from an alleged breach of contract.  Awad v. United States, 301 F.3d 1367, 1372 (Fed. Cir. 2002); see also Wood v. United States, 961 F.2d 195, 198 (Fed. Cir. 1992) ("If an action arises 'primarily from a contractual undertaking,' jurisdiction lies in the [Court of Federal Claims] 'regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract.'" (quoting San Carlos Irrigation and Drainage Dist. v. United States, 877 F.2d 957, 960 (Fed. Cir. 1989))).  However, for all of the reasons set forth above, the court has found that the VA did not breach its contract with FHSHA.  Where there is no breach, FHSHA's claim for tortious interference fails and must also be dismissed.